No. 22-50267

# In the United States Court of Appeals for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JORGE LUIS FLORES-ALTAMIRANO,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
The Honorable Dolly M. Gee, Presiding
No. ED CR-18-00242-DMG

# Appellant's Opening Brief

CUAUHTEMOC ORTEGA
Federal Public Defender
HOWARD SHNEIDER
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California  90012
213-894-1456

*Counsel for Defendant-Appellant*

# Table of Contents

Table of Authorities ................................................................................ iv

Issues Presented ......................................................................................1

Statement re Addendum............................................................................1

Statement of Jurisdiction..........................................................................2

Custody Status of Appellant .....................................................................2

Statement of the Case...............................................................................3

    1. The Arrest. ........................................................................................3

    2. The Motion to Suppress....................................................................9

Summary of Argument ...........................................................................13

Standards of Review ...............................................................................16

Argument.................................................................................................16

    1.  The Court should reverse the district court's denial of Jorge Luis Flores-Altamirano's motion and remand with instructions to suppress the evidentiary fruits of his unlawful arrest because ICE officers did not have probable cause that he committed a crime before his arrest..........................16

2. Alternatively, the Court should reverse the denial of the motion and remand for further proceedings because the arrest violated 8 U.S.C. § 1357(a)(4). ..............................................................................20

   A. The district court erroneously concluded that there was no statutory violation; even if the ICE officers had probable cause that Flores-Altamirano was guilty of an immigration felony, the other statutory requirement for a warrantless arrest was lacking because he was not likely to escape before an arrest warrant could be obtained. ...................21

   B. The district court legally erred to the extent it concluded that suppression is not an available remedy for this statutory violation. ........27

   C. The Court should remand for the district court to decide in the first instance whether suppression is appropriate under the circumstances. ...34

Conclusion ................................................................................39

Certificate of Related Cases....................................................40

Certificate of Compliance re Brief Length ............................41

Addendum................................................................................42

# Table of Authorities

**<u>Cases</u>**

*Alaska Oil & Gas Ass'n v. Pritzker*,
840 F.3d 671 (9th Cir. 2016) ...............................................................22

*Araujo v. United States*,
301 F. Supp. 2d 1095 (N.D. Cal. 2004).............................................36

*Arizona v. Gant*,
556 U.S. 332 (2009)...............................................................................17

*Bailey v. United States*,
568 U.S. 186 (2013)...............................................................................16

*Contreras v. United States*,
672 F.2d 307 (2d Cir. 1982) ...............................................................25

*DHS v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020).........................................................................37

*Galvan v. Press*,
347 U.S. 522 (1954)..............................................................................37

*Gonzalez v. Garland*,
__ F. App'x __, 2022 WL 807589 (9th Cir. Mar. 16, 2022).............................36

*Gonzalez v. USICE*,
975 F.3d 788 (9th Cir. 2020) ..............................................................19

*INS v. Chadha*,
462 U.S. 919 (1983)..............................................................................37

*Kerry v. Din*,
576 U.S. 86 (2015)................................................................................37

*Lincoln v. Vigil*,
508 U.S. 182 (1994)..............................................................................37

*Martinez-Medina v. Holder,*
    673 F.3d 1029 (9th Cir. 2011) ............................................................17

*McNabb v. United States,*
    318 U.S. 332 (1943) ...............................................................28, 29

*Miller v. United States,*
    357 U.S. 301 (1958) .............................................................................29

*Moreno v. Napolitano,*
    213 F. Supp. 3d 999 (N.D. Ill. 2016) .............................................36

*Mountain High Knitting, Inc. v. Reno,*
    51 F.3d 216 (9th Cir. 1995) ...............................................24, 25, 26

*Pullman-Standard v. Swint,*
    456 U.S. 273 (1982) .............................................................................38

*Sialoi v. City of San Diego,*
    823 F.3d 1223 (9th Cir. 2016) ............................................................17

*Takahashi v. Fish & Game Comm'n,*
    334 U.S. 410 (1948) .............................................................................37

*Tejeda-Mata v. INS,*
    626 F.2d 721 (9th Cir. 1980) .............................................................22

*United States v. Abdi,*
    463 F.3d 547 (6th Cir. 2006) .............................................................28

*United States v. Alvarado,*
    321 F.2d 336 (2d Cir. 1963) .............................................................26

*United States v. Barrera-Moreno,*
    951 F.2d 1089 (9th Cir. 1991) .....................................................31, 32

*United States v. Bautista-Ramos,*
    2018 WL 5726236 (N.D. Iowa 2018) ...............................................36

*United States v. Cantu,*
    519 F.2d 494 (7th Cir. 1975) .............................................................22

v

*United States v. De La Cruz,*
    835 F.3d 1 (1st Cir. 2016) ................................................................. 28

*United States v. Diaz-Lopez,*
    625 F.3d 1198 (9th Cir. 2010) ................................................. 18, 19

*United States v. Dreyer,*
    804 F.3d 1266 (9th Cir. 2015) .................................................. 28, 30

*United States v. Fernandez,*
    388 F.3d 1199 (9th Cir. 2004) .................................................. 32, 33

*United States v. Flores-Sandoval,*
    422 F.3d 711 (8th Cir. 2005) ............................................................. 21

*United States v. Hernandez-Quintania,*
    874 F.3d 1123 (9th Cir. 2017) .......................................................... 18

*United States v. Job,*
    871 F.3d 852 (9th Cir. 2017) ............................................................. 17

*United States v. Kvashuk,*
    29 F.4th 1077 (9th Cir. 2022) ......................................................... 16

*United States v. Midwest Oil Co.,*
    236 U.S. 459 (1915) ............................................................................ 37

*United States v. Mohamud,*
    843 F.3d 420 (9th Cir. 2016) ............................................................ 33

*United States v. Mora-Alcaraz,*
    986 F.3d 1151 (9th Cir. 2021) ......................................................... 38

*United States v. Ngumezi,*
    980 F.3d 1285 (9th Cir. 2020) ......................................................... 20

*United States v. Orozco-Acosta,*
    607 F.3d 1156 (9th Cir. 2010) ......................................................... 19

*United States v. Roberts,*
    779 F.2d 565 (9th Cir. 1986) .............................................. 28, 29, 30

*United States v. Ross*,
  372 F.3d 1097 (9th Cir. 2004) ........................................................32

*United States v. Santos-Portillo*,
  997 F.3d 159 (4th Cir. 2021) .........................................28, 30, 31, 35

*United States v. Segura-Gomez,*
  2018 WL 6259222 (E.D.N.C. 2018)................................................36

*United States v. Sellers*,
  906 F.3d 848 (9th Cir. 2018) ..........................................................38

*United States v. Simpson*,
  927 F.2d 1088 (9th Cir. 1991) ........................................................32

*United States v. Stinson*,
  647 F.3d 1196 (9th Cir. 2011) ...................................................31, 32

*United States v. Valdovinos-Mendez*,
  641 F.3d 1031 (9th Cir. 2011) ........................................................18

*United States v. Valera-Elizondo*,
  761 F.2d 1020 (5th Cir. 1985) ........................................................22

*U.S. ex rel. Martinez-Angosto v. Mason*,
  344 F.2d 673 (2d Cir. 1965) ......................................................24, 25

*Westover v. Reno*,
  202 F.3d 475 (1st Cir. 2000)...........................................................24

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
  481 U.S. 787 (1987)........................................................................29

## U.S. Constitution

U.S. Const., Amend. IV ...........................................................passim

## Statutes

8 U.S.C. § 1326.......................................................................passim

8 U.S.C. § 1357.......................................................................passim

18 U.S.C. § 922...............................................................................2

18 U.S.C. § 3231 .................................................................................... 2

28 U.S.C. § 1291 .................................................................................... 2

**Rules**

Fed. R. App. P. 32 ................................................................................. 41

Fed. R. App. P. 4 ................................................................................... 2

# Issues Presented

Jorge Luis Flores-Altamirano pleaded guilty to being a prohibited person in possession of a firearm and ammunition, but that plea was conditional in that it preserved his right to appeal the district court's denial of his motion to suppress the evidentiary fruits of his unlawful arrest by Immigration and Customs Enforcement (ICE) officers.

1.  The ICE officers did not have probable cause that Flores-Altamirano committed a crime before his arrest, so his warrantless arrest violated the Fourth Amendment. Should the Court reverse the district court's denial of the motion and remand with instructions to suppress the evidentiary fruits of the arrest?

2.  Even if the arrest complied with the Fourth Amendment, the officers exceeded their authority to arrest without a warrant under 8 U.S.C. § 1357(a)(4). And contrary to what the district court thought, suppression is an available remedy for a violation of this statute in some circumstances. Should the Court reverse the denial of the motion and remand for the district court to decide in the first instance whether the evidentiary fruits of the arrest should be suppressed?

# Statement re Addendum

Pertinent authority is set forth in an attached addendum.

1

# Statement of Jurisdiction

Jorge Luis Flores-Altamirano entered a conditional guilty plea to being a prohibited person in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(5)(A).[1] The district court, the Honorable Dolly M. Gee, Judge, presiding, had jurisdiction over this case under 18 U.S.C. § 3231.

The district court sentenced Flores-Altamirano on November 1, 2022, and entered its judgment three days later.[2] On November 14, Flores-Altamirano filed a timely notice of appeal.[3] *See* Fed. R. App. P. 4(b).

This Court has jurisdiction to hear this appeal from the final judgment of a district court under 28 U.S.C. § 1291.

# Custody Status of Appellant

Flores-Altamirano has completed serving his custodial sentence.

---

[1] ER-3–6, 187–231.

[2] ER-232–36.

[3] ER-237–42.

# Statement of the Case

Jorge Luis Flores-Altamirano entered a conditional plea of guilty to possessing a firearm and ammunition despite being prohibited from doing so based on his status as an alien illegally and unlawfully in the United States.[4] He preserved his right to have this Court review the district court's denial of his motion to suppress the evidence on which that conviction was based—the fruits of an unlawful arrest by ICE officers.[5]

## 1. The Arrest.

On May 11, 2018, Flores-Altamirano was arrested by local police for the misdemeanor offense of obstructing or resisting a police officer.[6] As a result of that arrest, his fingerprints were run through various databases—including ICE databases.[7] ICE reviewed the resulting database information and determined that Flores-Altamirano "was amenable to . . . enforcement action" to reinstate a prior removal order.[8] There is no mention in the record of ICE officials reviewing

---

[4]  ER-187–231.

[5]  ER-187–231.

[6]  ER-32, 36, 82, 137, 142–46, 182.

[7]  ER-32, 36, 82.

[8]  ER-32, 36, 82, 182.

database records before Flores-Altamirano's arrest to determine whether he obtained consent from the Attorney General or Secretary of the Department of Homeland Security to reapply for admission into the United States.[9]

Relying on the database information, ICE lodged an immigration detainer with the local police.[10] The detainer includes a notation "that probable cause exists that the subject is a removable alien" based on a "final order of removal" and "[b]iometric confirmation of" Flores-Altamirano's "identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law."[11] The local police did not honor the detainer and released Flores-Altamirano from jail without notifying ICE.[12]

Sometime after the detainer was lodged, an ICE team was assigned to Flores-Altamirano's case, which included officers Joseph Mujica, Angel Calderon, Jose Beltran, and Jesus Ibarra.[13] On June 18, the officers completed a Field Operations

---

[9]   ER-32–33, 35–38, 82–84, 137.

[10]   ER-32, 36, 82, 89, 91, 134, 137, 182.

[11]   ER-89, 184.

[12]   ER-32, 36, 82, 89, 91, 134, 137, 182.

[13]   ER-32, 36, 82, 91, 96, 134, 137, 182.

4

Worksheet (FOW), which included a physical description and photo of Flores-Altamirano.[14] The FOW also included his home address; the same address where the officers would eventually arrest him several weeks later.[15] At some point in time, Ibarra conducted surveillance at the home address and learned a vehicle there was registered to Flores-Altamirano's wife.[16] According to Mujica, the ICE team kept a copy of the FOW in a "working file folder."[17] But Mujica did not "have a specific recollection of every document contained" in the folder and instead could only speak in general terms about what such file folders typically contain.[18] On the FOW, there was a box checked for "Flight/Escape Risk," but neither the ICE officers nor the FOW itself provided any explanation for why that box was checked.[19] Despite the ICE officers having a physical description and photo of Flores-Altamirano and his home address, they did not arrest him at that time.

---

[14]  ER-110–12, 182.

[15]  ER-32, 36–37, 82–83, 110.

[16]  ER-137.

[17]  ER-92.

[18]  ER-92.

[19]  ER-92–94, 96–98, 110–12, 182.

Before arresting Flores-Altamirano, the ICE officers purportedly obtained what is referred to as an I-200 warrant.[20] That is an administrative warrant that gives ICE officers authority to arrest and take someone into custody for civil removal proceedings; not for criminal matters.[21] According to the officers, they were required to obtain an I-200 warrant *before* field operations: meaning, *before* they arrested Flores-Altamirano.[22] Despite this requirement, the government did not produce a copy of an I-200 warrant issued before Flores-Altamirano's arrest.[23] Instead, the government produced an I-200 warrant that was supposedly issued *after* Flores-Altamirano was arrested.[24] According to the officers, ICE's procedures require them to produce this alleged second I-200 warrant after an arrest for inclusion in "a case packet."[25] The government therefore claimed that there should be both a *pre*-arrest and *post*-arrest I-200 warrant for any arrest involving a violation of immigration laws where a suspect is apprehended.[26]

---

[20]  ER-42–44, 46, 92–94, 97–98, 100, 103–05, 133–35, 183–84.

[21]  ER-46, 100.

[22]  ER-92, 97.

[23]  ER-92, 97, 183–84.

[24]  ER-46, 92–94, 97–98, 100, 183–84.

[25]  ER-92, 97, 183–84.

[26]  ER-92–94, 97–98, 183–84.

The post-arrest warrant in Flores-Altamirano's case was produced under questionable circumstances. In ICE emails almost a year after his arrest, Mujica discussed printing an old copy of what the government characterized as the post-arrest I-200 warrant and having Calderon sign it.[27] Mujica explained that he thought the post-arrest warrant was missing, which is why he reprinted a copy from Flores-Altamirano's electronic file for Calderon to sign.[28] Calderon "thought it was strange the I-200 needed to be re-signed a year after the arrest[.]"[29] But re-signing an old warrant became moot after Mujica allegedly found the missing post-arrest warrant, which the government produced in discovery.[30]

The government never produced a copy of the purported pre-arrest warrant, and also never explained why it was missing or why there was no record of its existence.[31] Calderon explained that he did not "recall seeing a copy of the first issued Administrative Arrest Warrant in defendant's file after his arrest" and believed that "this first warrant may have been lost when the second I-200

---

[27]  ER-42–44, 103–05, 183–84.

[28]  ER-93.

[29]  ER-135.

[30]  ER-46, 92–94, 97–98, 100.

[31]  ER-182–84.

Administrative Arrest Warrant was created."[32] Calderon also stated "it's not standard procedure to keep copies of all FOW packets[,]" implying that ICE does not have procedures in place to maintain complete records related to immigration arrests.[33]

On July 25—over ten weeks after Flores-Altamirano's arrest and release by local police and over a month after the FOW was prepared—the officers conducted surveillance outside Flores-Altamirano's home so that they could arrest him.[34] On that day, the officers saw Flores-Altamirano walk out of the residence to his car, and then stopped the car after he began driving.[35] Flores-Altamirano presented a consular identification card to the officers, which confirmed his identity.[36] The officers arrested him, supposedly pursuant to the missing pre-arrest I-200 warrant.[37] There is no indication in the record that the officers made any prior

---

[32] ER-97.

[33] ER-135.

[34] ER-32, 36–37, 82–83, 91–92, 96, 134–35, 137, 182.

[35] ER-32, 37, 83, 91–92, 96, 134, 137, 183.

[36] ER-32, 37, 83, 92, 134–35, 137, 183.

[37] ER-32, 37, 83, 92, 96, 137, 183.

8

attempts to arrest Flores-Altamirano, so it appears they found him the first time they tried.[38]

The officers searched Flores-Altamirano and found a loaded magazine of ammunition in his pocket.[39] The officers asked Flores-Altamirano where the gun was, and he purportedly stated it was in the trunk and consented to its retrieval.[40]

After Flores-Altamirano's arrest, the ICE officers checked his electronic alien file, which showed that in 2008 he received a stipulated removal order in Arizona.[41] That file also showed that in 2020 he was removed to Mexico.[42]

## 2. The Motion to Suppress.

Flores-Altamirano moved to suppress the fruits of the unlawful arrest.[43] He argued that the government failed to meet its burden to prove that the arrest complied with the Fourth Amendment, which required suppression.[44] He further argued that suppression was independently required because the officers arrested

---

[38] ER-32, 36–37, 82–83, 91, 96, 134–35, 137, 182.

[39] ER-32, 37, 83, 92, 96, 135, 137, 183.

[40] ER-32, 37, 83, 92, 96, 135, 137, 183.

[41] ER-33, 37, 83, 182.

[42] ER-33, 37, 83, 182.

[43] ER-7–56.

[44] ER-19–22, 118–26, 128.

him without a warrant, and his warrantless arrest violated 8 U.S.C. § 1357(a)(4) because there was neither probable cause that he committed an immigration felony nor a likelihood that he would escape before a warrant could be obtained.[45] Flores-Altamirano explained that suppression was the proper remedy for this statutory violation, emphasizing that his warrantless arrest was part of a broader, systematic pattern of ICE officers making warrantless arrests across the country.[46]

The government opposed the motion.[47] It acknowledged ICE's "odd internal practices" regarding the production of a post-arrest warrant and failure to retain the purported pre-arrest warrant.[48] The government nevertheless claimed that what happened in this case was in line with ICE practices and the officers were "just acting in compliance" with those practices.[49] The government argued that the officers did in fact obtain an I-200 warrant before arresting Flores-Altamirano, which it asserted should end the analysis.[50]

---

[45]  ER-21–26, 118–26.

[46]  ER-22–26, 126–27.

[47]  ER-57–112.

[48]  ER-170.

[49]  ER-170.

[50]  ER-67–69.

In the alternative, the government claimed the officers had probable cause to arrest Flores-Altamirano for violating 8 U.S.C. § 1326, which was all that was required to arrest him in public under the Fourth Amendment.[51] As to § 1357(a)'s requirements, the government argued, among other things, that the statute allowed the officers to arrest Flores-Altamirano without a warrant because they had probable cause that he committed an "immigration offense" and had "a basis to believe he was a risk of flight."[52] In the government's view, even if the arrest violated § 1357, suppression was not an available remedy as long as it complied with the Fourth Amendment.[53]

The district court issued a written order denying the motion.[54] It held there was probable cause to believe Flores-Altamirano had violated 8 U.S.C. § 1326 because of a 2008 removal order and the officers' positive identification of him.[55] The district court found further support for probable cause based on notations on the immigration detainer stating that Flores-Altamirano was removable and that

---

[51]  ER-71–74.

[52]  ER-69–71.

[53]  ER-74–78.

[54]  ER-182–86.

[55]  ER-184–85.

biometrics confirmed his identity.[56] Because there supposedly was probable cause that Flores-Altamirano violated § 1326 "based upon his removal order and his positive identification[,]" the district court concluded that the officers did not violate the Fourth Amendment.[57]

Without a copy of the purported pre-arrest I-200 administrative warrant or a plausible explanation for why it would be missing from ICE's files, the district court assumed that there was no pre-arrest I-200 warrant for purposes of ruling on the motion.[58] In the absence of a warrant, the district court analyzed whether § 1357(a)(4) permitted the officers to arrest Flores-Altamirano anyway.[59] For the same reasons the district court concluded there was probable cause for a violation of § 1326 under the Fourth Amendment, it also found there was probable cause that Flores-Altamirano committed an immigration felony (§ 1326) to satisfy the

---

[56]  ER-89, 184.

[57]  ER-185.

[58]  ER-183–84.

[59]  ER-184–85. Although the government made a few passing references to § 1357(a)(2) in its opposition (ER-57–80) and at the suppression hearing (ER-164–72), the district court did not address subsection (a)(2) and focused its analysis only on subsection (a)(4).

first requirement of § 1357(a)(4).[60] Further, the district court found a likelihood of escape—the second requirement under § 1357(a)(4)—because Flores-Altamirano was subject to a 2008 final removal order, was subsequently removed, and had then purportedly returned to the United States.[61] The district court therefore concluded that the arrest complied with the requirements of § 1357(a)(4).[62] Regardless of compliance with those requirements, the district court apparently concluded that suppression was not an available remedy anyway, or was at least strongly inclined to do so given three out-of-circuit cases.[63]

# Summary of Argument

Jorge Luis Flores-Altamirano pleaded guilty to being a prohibited person in possession of a firearm and ammunition seized after he was arrested by ICE officers. For two reasons, the district court erred in denying Flores-Altamirano's motion to suppress the evidentiary fruits of that unlawful arrest.

---

[60]  ER-184–85.

[61]  ER-184–85.

[62]  ER-184–85.

[63]  ER-185.

First, the arrest violated the Fourth Amendment because the ICE officers did not have probable cause to believe that Flores-Altamirano committed a crime before the arrest. Even though the officers' professed reason for the arrest was to effectuate civil removal proceedings, the government claimed, and the district court found, that the information the officers had established probable cause for a violation of 8 U.S.C. § 1326, which makes it a crime for an alien who has been removed to thereafter be found in the United States *without permission to reapply for admission*. Although the ICE officers purportedly knew that Flores-Altamirano had previously been removed, the record does not establish that they even looked for, let alone found, records pertaining to whether he sought or obtained permission to reenter the country. The government therefore failed to meet its burden to prove that the arrest complied with the Fourth Amendment, so the Court should reverse the district court's denial of Flores-Altamirano's motion and remand with instructions to suppress the evidence derived from the unlawful arrest.

Second, even if the arrest complied with the Fourth Amendment, it violated 8 U.S.C. § 1357(a), which limits the ability of ICE officers to arrest without a warrant. The district court found that the officers complied with § 1357(a)(4), which allowed them to arrest Flores-Altamirano based on probable cause of an immigration felony, but only if there was a likelihood of him escaping before a

warrant could be obtained. Again, there was no such probable cause, but even if there were, the government failed to establish that the second requirement was satisfied. The ICE officers knew of Flores-Altamirano's purported immigration status and his home address for at least several weeks. They not only had time to get a warrant; they claimed they did so, but the government did not prove to the district court's satisfaction that that was true. Given these facts, the district court erred in concluding that the ICE officers did not violate § 1357(a)(4). It also erred in its apparent conclusion that suppression is not an available remedy for the statutory violation. Precedent allows courts to exclude evidence for statutory violations when needed to deter future violations, or when government misconduct in a particular case is flagrant and causes substantial prejudice to the defendant. Because the district court did not understand that it had this discretion, the Court should reverse the denial of the motion and remand with instructions for the district court to decide in the first instance whether the evidentiary fruits of the unlawful arrest should be suppressed.

# Standards of Review

The Court reviews the denial of a motion to suppress de novo and any underlying factual findings for clear error. *United States v. Kvashuk*, 29 F.4th 1077, 1085 (9th Cir. 2022).

# Argument

**1. The Court should reverse the district court's denial of Jorge Luis Flores-Altamirano's motion and remand with instructions to suppress the evidentiary fruits of his unlawful arrest because ICE officers did not have probable cause that he committed a crime before his arrest.**

Jorge Luis Flores-Altamirano's conviction for being a prohibited person in possession of a gun and ammunition is based on evidence seized after he was unlawfully arrested by ICE officers. That evidence should have been suppressed because the officers did not have probable cause that Flores-Altamirano committed a crime before his arrest.

The Fourth Amendment protects people from unreasonable searches and seizures and generally requires a warrant issued upon probable cause. U.S. Const., Amend. IV; *Bailey v. United States*, 568 U.S. 186, 192-93 (2013). Searches and

seizures without such a warrant are "per se unreasonable"—"subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (cleaned up). When the government seeks to use evidence derived from a warrantless search or seizure, it bears the burden to prove that one of these exceptions applies. *United States v. Job*, 871 F.3d 852, 860 (9th Cir. 2017). The exception at issue here allows a warrantless arrest, but only with "probable cause, which exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016) (cleaned up). "Whether probable cause exists depends on the totality of facts available to the officers, who may not disregard facts tending to dissipate probable cause." *Id*. (cleaned up). The district court found that the ICE officers who arrested Flores-Altamirano had probable cause that he had violated 8 U.S.C. § 1326.[64] It was wrong.

No federal criminal statute makes "unlawful presence in the United States, alone, a federal crime." *Martinez-Medina v. Holder*, 673 F.3d 1029, 1036 (9th Cir. 2011). To violate § 1326, an alien must have been removed from the United States and thereafter be found here, unless "prior to his reembarkation at a place outside

---

[64] ER-184–85.

the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission[.]" 8 U.S.C. § 1326(a)(2)(A). Although the officers claimed that ICE records revealed Flores-Altamirano had been previously removed, there was no evidence that before they arrested him they looked into whether he came back to the United States *without permission to reapply for admission*.

When a person seeks consent to reapply for reentry into the United States, there should be some record of the application. *See United States v. Diaz-Lopez*, 625 F.3d 1198, 1199 (9th Cir. 2010) (describing a document called a Form I-212, which "is the required application for permission to reapply for admission to the United States after having been previously removed"). In order to determine whether any record of a person seeking permission to reapply for admission exists, ICE typically reviews information in multiple databases and a suspect's alien file (A-file). *See United States v. Hernandez-Quintania*, 874 F.3d 1123, 1127 (9th Cir. 2017) ("[T]wo separate immigration databases revealed no evidence that Hernandez-Quintania requested permission to reenter the United States after his last deportation."); *United States v. Valdovinos-Mendez*, 641 F.3d 1031, 1033-34 (9th Cir. 2011) (no record of the defendant having applied for permission to reenter in A-file or two immigration databases that would include such records: the

18

Central Index System and the Computer Linked Applications Information

Management System (CLAIMS)); *United States v. Orozco-Acosta*, 607 F.3d 1156,

1162 (9th Cir. 2010) (no record that defendant filed the form required to reapply

for admission in the A-file or in the CLAIMS database); *United States v. Diaz-

Lopez*, 625 F.3d 1198, 1199 (9th Cir. 2010) (no record in CLAIMS database of a

Form I-212 showing defendant had sought permission to reapply for admission);

*see also Gonzalez v. USICE,* 975 F.3d 788, 821 (9th Cir. 2020) (explaining that, as

of December 2017, ICE had access to 16 databases it could search to determine

whether there was probable cause to place an immigration detainer in a given

case).

While "the government may rely on a computer database to make a probable

cause determination[,]" it failed to do so here. *Gonzalez*, 975 F.3d at 819. Before

the arrest the ICE officers purportedly searched "DHS/ICE databases" to determine

Flores-Altamirano was "amenable to . . . enforcement action" to reinstate a prior

removal order.[65] But the government presented no evidence that before the arrest

they used those same databases (or any other information at their disposal) to

determine whether Flores-Altamirano ever requested or received consent to

---

[65] ER-32, 36, 82.

reapply for admission. The government therefore failed to establish probable cause for a violation of § 1326.

Because the government did not meet its burden to prove that Flores-Altamirano's warrantless arrest complied with the Fourth Amendment, all evidentiary fruits of that constitutional violation must be suppressed. *United States v. Ngumezi*, 980 F.3d 1285, 1290 (9th Cir. 2020). The government did not dispute below that those fruits include the gun, the ammunition, and any statements Flores-Altamirano made about them.[66] The Court should therefore reverse the district court's denial of his suppression motion and remand with instructions to grant that motion. If it does so, the Court need not reach the following statutory argument.

## 2. Alternatively, the Court should reverse the denial of the motion and remand for further proceedings because the arrest violated 8 U.S.C. § 1357(a)(4).

Even if the arrest did not violate the Fourth Amendment, that is not the end of the matter because § 1357(a) allows ICE officers to arrest someone without a warrant only under limited circumstances. The district court found that Flores-Altamirano's arrest was authorized under § 1357(a)(4).[67] It also believed

---

[66] ER-71–78.

[67] ER-184–85.

suppression was not an available remedy for a violation of this statute.[68] Because the district court erred as to both these matters, the Court should reverse its denial of Flores-Altamirano's motion and remand for the district court to decide in the first instance if suppression is appropriate under the circumstances.

**A. The district court erroneously concluded that there was no statutory violation; even if the ICE officers had probable cause that Flores-Altamirano was guilty of an immigration felony, the other statutory requirement for a warrantless arrest was lacking because he was not likely to escape before an arrest warrant could be obtained.**

Section 1357(a)(4) allows an ICE officer to "make arrests for felonies . . . regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony *and* if there is likelihood of the person escaping before a warrant can be obtained for his arrest[.]" 8 U.S.C. § 1357(a)(4) (emphasis added). The government did not meet its burden to prove that either of these requirements, let alone both, were satisfied. *Cf. United States v. Flores-Sandoval*, 422 F.3d 711, 714 (8th Cir. 2005) (explaining that a

---

[68] ER-185.

plain reading of § 1357(a)(1) requires the government to establish immigration officials complied with the statutory requirements).

With regard to the first requirement, the "phrase 'has reason to believe' has been equated with the constitutional requirement of probable cause." *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980). As discussed above, the officers did not have probable cause for the only asserted immigration felony (§ 1326). But the Court will not reach the statutory argument unless it finds otherwise and concludes that the arrest was constitutional, so we will move on to the second requirement.

Even when an ICE officer has probable cause, he may not arrest unless "there is likelihood of the person escaping before a warrant can be obtained for his arrest[.]" 8 U.S.C. § 1357(a)(4). The likelihood-of-escape limitation is "seriously applied" by the courts. *United States v. Cantu*, 519 F.2d 494, 496-97 (7th Cir. 1975). Although it appears courts have not defined "likelihood" in the context of § 1357(a), by its plain terms and pertinent dictionary definitions, "likelihood" approximates a standard of "more likely than not" or, more simply put, "probable." *See Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 684 (9th Cir. 2016) (embracing interpretation of "likely" as having its common meaning of "more likely than not" and citing multiple dictionaries that define "likely" "to mean that an event, fact, or outcome is probable"); *United States v. Valera-Elizondo*, 761

F.2d 1020, 1025 (5th Cir. 1985) ("[W]e assign to 'likely' its ordinary meaning of 'more probable than not.'").

Here, the government failed to establish it was probable that Flores-Altamirano would escape before the ICE officers could obtain a warrant. ICE became aware of Flores-Altamirano's state arrest on May 11, 2018.[69] About a month later, on June 18, the ICE officers prepared a Field Operation Worksheet (FOW) that included Flores-Altamirano's address, where he was ultimately arrested.[70] At some point, one of the ICE officers surveilled that address and found a car registered to Flores-Altamirano's wife.[71] Thus, the officers knew where to find Flores-Altamirano as early as June 18. Had they truly been concerned that he would escape, they would have tried to arrest him then, or soon thereafter. But instead the officers waited over a month from when they completed the FOW—and over ten weeks from his arrest on the state case—to finally arrest him on July 25.[72]

Moreover, the officers had time to get an I-200 warrant and, according to the officers, did get one.[73] The district court did not credit the officers' claim that they

---

[69] ER-32, 36, 82. 137, 142–46, 182.

[70] ER-110–12, 182.

[71] ER-137.

[72] ER-32, 36–37, 82–83, 91–92, 96–97, 134–35, 137, 182.

[73] ER-92–94, 97–98, 133–35.

actually obtained a pre-arrest warrant.[74] But the idea that Flores-Altamirano was likely to escape because there was not enough time to get a warrant is contradicted by the officers' own account of what happened. Under these facts, the government was far from showing it was probable that Flores-Altamirano would escape before the officers could obtain a warrant.

Courts have found no likelihood of escape before a warrant could be obtained in similar situations where a suspect was found in their home or workplace. *See Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218-19 (9th Cir. 1995) (no reason to believe that noncitizens working in factory were likely to escape before warrants could be obtained); *Westover v. Reno*, 202 F.3d 475, 479-80 (1st Cir. 2000) (no evidence that woman in her own home was likely to escape before warrant could be obtained); *U.S. ex rel. Martinez-Angosto v. Mason*, 344 F.2d 673, 679-80 (2d Cir. 1965) (finding no likelihood of escape for Spanish soldier who had allegedly deserted his military sea vessel where immigration authorities confronted him at the factory where he worked, and he took them to his home).

Despite the undisputed evidence that the ICE officers not only had time to obtain a warrant but claimed they actually did so, the district court found that the likelihood-of-escape requirement was satisfied because Flores-Altamirano was

---

[74] ER-183–84.

subject to a 2008 removal order, had been removed in 2010, and apparently returned to the United States thereafter.[75] It relied on two Second Circuit opinions that involved significantly different circumstances where officers had to make quick on-the-scene decisions in which there was a real risk that the defendant might escape *before a warrant could be obtained*.

In *Contreras v. United States,* the court explained that before making a warrantless arrest, an officer must have "reason to believe that the alien is likely to escape before a warrant can be obtained for his or her arrest." 672 F.2d 307, 308 (2d Cir. 1982). There, INS officers received an anonymous tip about suspected noncitizens living in the same apartment building. *Id.* Once officers made contact with Contreras for the first time, in her apartment, she acknowledged "that she had entered this country illegally." *Id.* at 308-09. She had her passport in the apartment, which indicated the ability to leave the country if need be. *Id.* at 308. The Second Circuit concluded that "[b]ecause of the difficulty of making an on-the-spot determination as to the likelihood of escape without any opportunity to verify information provided or to conduct a full-scale interview, an (INS) officer's determination will not be upset if there is any reasonable basis for it." *Id.* (cleaned up). The district court cited *Contreras* for the proposition that "when the alien's

---

[75] ER-184–85.

deportability is clear and undisputed, that circumstance alone may provide a sufficient basis . . . to believe that escape is likely before a warrant can be obtained." *Id.* at 309.[76] But that was not the court's holding in *Contreras*, which addressed a civil claim for damages against the United States. Instead, the court analyzed "all the circumstances" of the officers' encounter with the suspects, and after walking through those circumstances, concluded that the suspects were likely to escape before a warrant could be secured. *Id*. at 309.

In *United States v. Alvarado*, the defendant was being investigated for involvement with shipping narcotics. 321 F.2d 336, 337 (2d Cir. 1963). As part of the narcotics investigation, while at Alvarado's apartment, an agent asked whether Alvarado was an American citizen, and he said he was from Panama. *Id.* The agent then examined Alvarado's passport and, for the first time, learned he was in the country illegally. *Id.* at 337-38. Similar to *Contreras*, law enforcement officials in *Alvarado* did not have the pertinent information about the defendant's immigration status until the first in-person meeting with the defendant, at which point the agents realized the defendant also had a passport and the ability to flee. Under those circumstances, the court in *Alvarado* concluded "the arresting officers had reason

---

[76]  ER-184.

to believe that unless arrested appellant would be likely to escape *before a warrant could be obtained*." *Id.* at 338 (emphasis added).

Unlike in *Contreras* and *Alvarado*, there was no "on-the-spot determination" that Flores-Altamirano was likely to escape if the officers left to obtain a warrant first. The officers had over ten weeks to locate and arrest Flores-Altamirano based on information they received from the ICE databases. They knew where Flores-Altamirano lived, and could easily go to his residence. They also knew that a car registered to his wife was at the residence. The officers had more than enough time to obtain a warrant, and claimed they did in fact obtain one before the arrest. Thus, there was no likelihood of Flores-Altamirano escaping before a warrant could be obtained for his arrest. The government certainly failed to prove the contrary. Therefore, Flores-Altamirano's arrest violated § 1357(a)(4).

## B. The district court legally erred to the extent it concluded that suppression is not an available remedy for this statutory violation.

The district court apparently concluded that even if there were a violation of § 1357(a), suppression was not an available remedy; or it was at least strongly inclined to reach that conclusion based on three opinions from other circuits.[77] *See*

---

[77] ER-185.

*United States v. Santos-Portillo*, 997 F.3d 159, 162-67 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 615 (2021); *United States v. De La Cruz*, 835 F.3d 1, 5-6 (1st Cir. 2016); *United States v. Abdi*, 463 F.3d 547, 555-57 (6th Cir. 2006). But contrary to this out-of-circuit authority, this Court's precedent holds that courts may exclude evidence when needed to deter future statutory violations. *United States v. Roberts*, 779 F.2d 565, 568 (9th Cir. 1986); *see United States v. Dreyer*, 804 F.3d 1266, 1278 (9th Cir. 2015) (en banc) (recognizing that suppression for statutory violations may be justified in "rare circumstances").

This principle—that exclusion can be a proper remedy for a statutory violation—dates back to the Supreme Court's decision in *McNabb v. United States*, 318 U.S. 332, 340-47 (1943). There, federal revenue agents arrested and conducted days-long interrogations of the suspects in violation of a federal statute requiring that arrestees be promptly presented to the nearest commissioner or judge for a hearing. *Id.* at 342. The Supreme Court warned that "a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law." *Id.* at 345. In excluding evidence extracted from the illegal detentions, the Supreme Court explained that the "principles governing the admissibility of evidence in federal criminal trials

have not been restricted [] to those derived solely from the Constitution." *Id.* at 341. Instead, the Court "from the very beginning of its history, formulated rules of evidence to be applied in federal criminal prosecutions." *Id.* After *McNabb*, the Supreme Court continued to recognize federal courts' authority to regulate evidentiary procedures so they "are conducted in a manner consistent with basic notions of fairness." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 808 (1987); *see, e.g., Miller v. United States*, 357 U.S. 301, 312-14 (1958) (excluding evidence obtained in violation of statutory regulation on no-knock warrants).

This Court's precedent is in line with the dictates of *McNabb*. For example, in *United States v. Roberts*, the defendants were charged with crimes related to marijuana on board a sailboat that was interdicted by Coast Guard personnel working in conjunction with the Navy. 779 F.2d at 566. The defendants argued that the violation of statutory prohibitions against military involvement in civilian law enforcement should result in suppression of the marijuana. *Id.* at 566-67. After analyzing the pertinent statutory scheme, the Court concluded that the Navy had violated that statute. *Id.* at 567-68. When it came to the appropriate remedy, the Court held "that an exclusionary rule should not be applied" to statutory violations "until a need to deter future violations is demonstrated." *Id.* at 568. Because the record did not show the Navy had "engaged in widespread and repeated violations"

29

of the applicable statute, suppression was not warranted in that particular case. *Id.*

The Court also noted that suppression was inappropriate because "the Navy's

violation was unintentional and in good faith." *Id.*

This Court later confirmed that suppression may be a proper remedy for

statutory violations in *United States v. Dreyer*. There, the defendant alleged that

the Navy's involvement in a civil criminal investigation violated the Posse

Comitatus Act (PCA) and warranted suppression. 804 F.3d at 1269-70. The Court

concluded that the Navy's actions had violated statutory restrictions on military

involvement in civilian law enforcement activity. *Id.* at 1272-77. Although the

Court declined to exclude the evidence, it affirmed *Roberts*' holding, explaining

that the exclusionary rule may be applied to statutory violations when "a need to

deter future violations is demonstrated." *Id.* at 1280 (cleaned up). The Court also

recognized that Supreme Court caselaw since *Roberts* explained exclusion "is a

remedy of last resort that is warranted only when the deterrence benefits outweigh

[the] heavy costs." *Id.* at 1278 (cleaned up).[78]

---

[78] In the Fourth Circuit case relied on by the district court, *Santos-Portillo*, a
dissenting judge agreed with this Court's approach. 997 F.3d at 167-70 (Floyd, CJ,
dissenting). He pointed out that the majority "too narrowly views federal courts'
inherent authority to supervise the proceedings before them." *Id.* at 168. Citing
*McNabb*, the dissenter invoked the longstanding authority of courts to "establish

While the Court in *Roberts* and *Dreyer* specifically analyzed suppression as a remedy for a statutory violation, a separate line of this Court's cases speaks more generally of courts' supervisory powers in the context of outrageous government conduct. Courts are permitted to dismiss an indictment for outrageous government conduct in "extreme cases" where the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson*, 647 F.3d 1196, 1209-10 (9th Cir. 2011) (cleaned up). In such circumstances dismissal is appropriate because the government misconduct "amounts to a due process violation." *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991).

But even when outrageous government conduct does not rise to the level of a due process violation, courts are still empowered to dismiss an indictment by

---

and maintain civilized standards of procedure and evidence." *Id.* (cleaned up). He explained that the majority's reliance on cases dealing with judicially-created causes of action was beside the point. Instead, suppression "is merely an evidentiary remedy to deter government reliance on illegally obtained evidence at trial." *Id.* at 169. Rather than view *McNabb* as "a relic of a bygone era," the dissenting judge would have held "that systemic or repeated violations of § 1357(a) could tip the balance in favor of the suppression remedy in a given case." *Id.* at 168, 170.

utilizing the same inherent supervisory powers discussed above. *United States v. Ross,* 372 F.3d 1097, 1109-10 (9th Cir. 2004). Courts may use these supervisory powers to dismiss an indictment for any of three reasons: "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct." *Stinson*, 647 F.3d at 1210 (cleaned up); *see Barrera-Moreno*, 951 F.2d at 1091-93 (outlining same three bases for exercising courts' supervisory powers); *United States v. Simpson*, 927 F.2d 1088, 1090-91 (9th Cir. 1991) (same). Unlike the showing needed to establish a due process violation—i.e., government conduct so grossly shocking and so outrageous as to violate the universal sense of justice—for a court to use its supervisory powers to dismiss an indictment, there must be flagrant government misconduct and substantial prejudice to the defendant. *Ross,* 372 F.3d 1110; *see United States v. Fernandez*, 388 F.3d 1199, 1238-39 (9th Cir. 2004) (dismissal under supervisory powers unwarranted where government used confidential informant who engaged in illegal conduct).

This Court's cases discussing supervisory authority in the context of outrageous government conduct analyze the propriety of dismissal as a remedy. But by implication, if courts may dismiss an indictment, they may also implement a

remedy short of dismissal such as suppression. *See United States v. Mohamud*, 843 F.3d 420, 437 (9th Cir. 2016) ("As the district court recognized, *it had the power to suppress evidence*, or even dismiss the indictment or grant a new trial, under its supervisory and statutory authority.") (emphasis added). These cases support the conclusion that suppression would be appropriate even without evidence of widespread and repeated statutory violations, if the government's misconduct in a given case was flagrant and caused substantial prejudice to the defendant. *See Fernandez*, 388 F.3d at 1239. Thus, the line of cases discussing outrageous government conduct provides a separate standard that empowers courts to suppress evidence in the face of a statutory violation.

    The above-described precedent establishes that suppression is an appropriate remedy for a statutory violation if *either* it would deter future violations of the statute *or* there was flagrant government misconduct. The district court therefore legally erred when it apparently concluded that suppression was categorically barred as a remedy for a violation of § 1357(a)(4).[79]

---

[79] ER-185.

**C. The Court should remand for the district court to decide in the first instance whether suppression is appropriate under the circumstances.**

Because the district court erred in failing to realize that Flores-Altamirano's arrest violated § 1357(a)(4) and that suppression was an available remedy for that misconduct, it did not reach his argument that the circumstances warranted suppression given both the ICE officers' actions in this particular case and the broader practice of improper warrantless arrests by ICE.[80] That argument was well founded.

For example, the district court was surprised that it had "received neither a copy of the original I-200 administrative warrant in this case nor a plausible explanation why it would be missing from Defendant's [immigration files] if the officers had acted in accordance with the agency's policy and practice."[81] It also expressed "alarm that officers sought to recreate a believed-missing warrant," apparently a version created *after* the arrest.[82] In doing so, the district court acknowledged the need to deter such conduct in the future: "The Court urges the Government in the

---

[80]  ER-21–26, 126–27.

[81]  ER-183–84.

[82]  ER-184 n.2. Even the government conceded that ICE had "odd internal practices" with regard to creating post-arrest warrants. ER-170.

strongest possible terms to educate the officers in [ICE's Enforcement and Removal Operations Fugitive Operations Team] that recreating and backdating a missing warrant would be considered evidence tampering and would be sanctionable conduct."[83]

That Flores-Altamirano's arrest is indicative of a widespread practice of illegal, warrantless immigration arrests is reflected in reported decisions where courts found violations of § 1357. For example, in *Santos-Portillo*—one of the out-of-circuit cases relied on by the district court to decline application of the exclusionary rule—the record "presented compelling evidence of repeated [statutory] violations[.]" 997 F.3d 159, 170 (Floyd, CJ, dissenting). As described in the *Santos-Portillo* dissent, one agent "admitted to routinely failing to secure arrest warrants[.]" *Id.*; *see id.* at 162 (quoting question asked to agent at detention hearing about his general practices of obtaining a warrant before arresting a suspect on an immigration violation, and the agent's answer that he does not secure warrants in those situations). And the practice of making warrantless arrests "was blessed by ICE counsel[.]" *Id.* at 170. Supporting the conclusion that ICE's practice of warrantless arrests was widespread, the dissenting judge noted that in a 2017 case from the Eastern District of North Carolina the district court found that a similar

---

[83] ER-184 n.2.

warrantless arrest violated § 1357(a). *Id.* (citing *United States v. Segura-Gomez*, 2018 WL 6259222 (E.D.N.C. 2018)).

The practice of warrantless arrests also came to light in Iowa, where ICE agents arrested 11 to 15 people on the same day, all without a warrant, despite having "leads" on them before carrying out the arrests. *See United States v. Bautista-Ramos*, 2018 WL 5726236, at *2 (N.D. Iowa 2018). There, the district court found a "troubl[ing] . . . practice of effecting warrantless arrests without regard to the requirements of § 1357(a)[,]" but concluded it lacked authority to suppress the illegally obtained evidence. *Id.* at *8-9.

Other cases also show that ICE's violations of § 1357(a) are widespread. *See, e.g., Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1005-06 (N.D. Ill. 2016) (noting that "ICE's policies and practices" do not require a likelihood of escape determination before executing a warrantless arrest); *Araujo v. United States*, 301 F. Supp. 2d 1095, 1101-02 (N.D. Cal. 2004) ("The government has not attempted to demonstrate, and cannot demonstrate, that Jose Araujo was 'likely to escape before a warrant can be obtained.' The only evidence in the record is to the contrary[.]"); *see also Gonzalez v. Garland*, __ F. App'x __, 2022 WL 807589, at *1 (9th Cir. Mar. 16, 2022) (unpublished) (granting petition for review and remanding to BIA where petitioner argued ICE officers who arrested him

36

egregiously violated agency regulations by failing to secure a warrant and not identifying themselves as ICE officers).

Making sure that ICE officers comply with § 1357(a) in the future is of the utmost importance. Enforcing immigration laws falls within the exclusive domain of the federal government. *See, e.g., Kerry v. Din*, 576 U.S. 86, 97 (2015); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948). Within that domain, the Supreme Court has time and again held that Congress's power is paramount among the branches. *INS v. Chadha*, 462 U.S. 919, 940 (1983) ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question[.]"); *Galvan v. Press*, 347 U.S. 522, 530-31 (1954) (explaining that Congress's power over the admission of noncitizens is broad and entrusted exclusively to Congress). Executive branch officials have discretion in how they enforce immigration law, but Congress has put limits on that discretion. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905-15 (2020) (finding executive policymaking on immigration matters cabined by the Administrative Procedure Act). Executive agents are not free to act outside of these Congressional limitations. *Lincoln v. Vigil*, 508 U.S. 182, 193 (1994) ("an agency is not free simply to disregard statutory responsibilities"). And agencies cannot override Congress's exercise of legislative power. *See United States v. Midwest Oil Co.*,

236 U.S. 459, 505 (1915) ("The Constitution does not confer upon [the president] any power to enact laws or to suspend or repeal such as the Congress enacts."). In the immigration context, Congress gave ICE officers a specific, but closely circumscribed, grant of authority to make arrests. *See*, *e.g.*, 8 U.S.C. § 1357(a)(4) (giving the power to make warrantless arrests only "if there is likelihood of the person escaping before a warrant can be obtained for his arrest"). Courts should ensure that ICE officers do not exceed that authority.

Again, however, the district court did not consider any of this due to its legal errors. Therefore, if the Court concludes that Flores-Altamirano's arrest violated § 1357(a)(4), it should remand for the district court to decide in the first instance whether the circumstances warrant suppression for that violation. *See United States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018) ("When a district court applies the wrong legal standard," the Court follows its "normal practice" to "remand the case so that it may apply the correct one in the first instance.") (cleaned up). That question involves factual findings that this Court cannot make itself. *See Pullman-Standard v. Swint*, 456 U.S. 273, 291-92 (1982) ("Factfinding is the basic responsibility of district courts, rather than appellate courts, and the Court of Appeals should not have resolved in the first instance [a] factual dispute which had not been considered by the District Court.") (cleaned up); *see also United States v.*

*Mora-Alcaraz*, 986 F.3d 1151, 1157-58 (9th Cir. 2021) ("remanding is often the appropriate action when the issue is not purely legal because a district court is usually best positioned to apply the law to the record") (cleaned up).

# Conclusion

For the foregoing reasons, the Court should reverse the district court's denial of Flores-Altamirano's suppression motion and remand with instructions to grant the motion because his arrest violated the Fourth Amendment. Alternatively, the Court should hold that the arrest did not comply with § 1357(a)(4) and remand for the district court to decide in the first instance whether suppression is appropriate for that statutory violation.

June 27, 2023                              Respectfully submitted,

                                           CUAUHTEMOC ORTEGA
                                           Federal Public Defender
                                              /s/ *Howard Shneider*
                                           HOWARD SHNEIDER
                                           Deputy Federal Public Defender

# Certificate of Related Cases

Counsel for appellant is unaware of any cases currently pending in this Court that are related for purposes of Circuit Rule 28-2.6.

June 27, 2023

_____/s/ _Howard Shneider_____

HOWARD SHNEIDER
Deputy Federal Public Defender

# Certificate of Compliance re Brief Length

This brief contains 7,755 words, excluding the items exempted by Fed. R. App.

P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5)

and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.

June 27, 2023                                    ____/s/ *Howard Shneider*_____
                                                 HOWARD SHNEIDER
                                                 Deputy Federal Public Defender

# **Addendum**

U.S. Const., Amend. IV ............................................................... 1a

18 U.S.C. § 1357 .......................................................................... 2a

United States Code Annotated
    Constitution of the United States
        Annotated
            Amendment IV. Searches and Seizures; Warrants

U.S.C.A. Const. Amend. IV-Search and Seizure; Warrants

Amendment IV. Searches and Seizures; Warrants

Currentness

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for this amendment.>

U.S.C.A. Const. Amend. IV-Search and Seizure; Warrants, USCA CONST Amend. IV-Search and Seizure; Warrants
Current through P.L. 118-6. Some statute sections may be more current, see credits for details.

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

AOB Addendum 1a

United States Code Annotated
Title 8. Aliens and Nationality (Refs & Annos)
Chapter 12. Immigration and Nationality (Refs & Annos)
Subchapter II. Immigration
Part IX. Miscellaneous

8 U.S.C.A. § 1357

§ 1357. Powers of immigration officers and employees

Effective: August 12, 2006
Currentness

**(a) Powers without warrant**

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant--

**(1)** to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

**(2)** to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;

**(3)** within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;

**(4)** to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and

**(5)** to make arrests--

**(A)** for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

AOB Addendum 2a

**(B)** for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.

**(b) Administration of oath; taking of evidence**

Any officer or employee of the Service designated by the Attorney General, whether individually or as one of a class, shall have power and authority to administer oaths and to take and consider evidence concerning the privilege of any person to enter, reenter, pass through, or reside in the United States, or concerning any matter which is material or relevant to the enforcement of this chapter and the administration of the Service; and any person to whom such oath has been administered, (or who has executed an unsworn declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of Title 28) under the provisions of this chapter, who shall knowingly or willfully give false evidence or swear (or subscribe under penalty of perjury as permitted under section 1746 of Title 28) to any false statement concerning any matter referred to in this subsection shall be guilty of perjury and shall be punished as provided by section 1621 of Title 18.

**(c) Search without warrant**

Any officer or employee of the Service authorized and designated under regulations prescribed by the Attorney General, whether individually or as one of a class, shall have power to conduct a search, without warrant, of the person, and of the personal effects in the possession of any person seeking admission to the United States, concerning whom such officer or employee may have reasonable cause to suspect that grounds exist for denial of admission to the United States under this chapter which would be disclosed by such search.

**(d) Detainer of aliens for violation of controlled substances laws**

In the case of an alien who is arrested by a Federal, State, or local law enforcement official for a violation of any law relating to controlled substances, if the official (or another official)--

**(1)** has reason to believe that the alien may not have been lawfully admitted to the United States or otherwise is not lawfully present in the United States,

AOB Addendum 3a

**(2)** expeditiously informs an appropriate officer or employee of the Service authorized and designated by the Attorney General of the arrest and of facts concerning the status of the alien, and

**(3)** requests the Service to determine promptly whether or not to issue a detainer to detain the alien,

the officer or employee of the Service shall promptly determine whether or not to issue such a detainer. If such a detainer is issued and the alien is not otherwise detained by Federal, State, or local officials, the Attorney General shall effectively and expeditiously take custody of the alien.

**(e) Restriction on warrantless entry in case of outdoor agricultural operations**

Notwithstanding any other provision of this section other than paragraph (3) of subsection (a), an officer or employee of the Service may not enter without the consent of the owner (or agent thereof) or a properly executed warrant onto the premises of a farm or other outdoor agricultural operation for the purpose of interrogating a person believed to be an alien as to the person's right to be or to remain in the United States.

**(f) Fingerprinting and photographing of certain aliens**

**(1)** Under regulations of the Attorney General, the Commissioner shall provide for the fingerprinting and photographing of each alien 14 years of age or older against whom a proceeding is commenced under section 1229a of this title.

**(2)** Such fingerprints and photographs shall be made available to Federal, State, and local law enforcement agencies, upon request.

**(g) Performance of immigration officer functions by State officers and employees**

**(1)** Notwithstanding section 1342 of Title 31, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

**(2)** An agreement under this subsection shall require that an officer or employee of a State or political subdivision of a State performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function, and shall contain a written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws.

**(3)** In performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the Attorney General.

AOB Addendum 4a

**(4)** In performing a function under this subsection, an officer or employee of a State or political subdivision of a State may use Federal property or facilities, as provided in a written agreement between the Attorney General and the State or subdivision.

**(5)** With respect to each officer or employee of a State or political subdivision who is authorized to perform a function under this subsection, the specific powers and duties that may be, or are required to be, exercised or performed by the individual, the duration of the authority of the individual, and the position of the agency of the Attorney General who is required to supervise and direct the individual, shall be set forth in a written agreement between the Attorney General and the State or political subdivision.

**(6)** The Attorney General may not accept a service under this subsection if the service will be used to displace any Federal employee.

**(7)** Except as provided in paragraph (8), an officer or employee of a State or political subdivision of a State performing functions under this subsection shall not be treated as a Federal employee for any purpose other than for purposes of chapter 81 of Title 5 (relating to compensation for injury) and sections 2671 through 2680 of Title 28 (relating to tort claims).

**(8)** An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law.

**(9)** Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection.

**(10)** Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State--

**(A)** to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

**(B)** otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

**(h) Protecting abused juveniles**

An alien described in section 1101(a)(27)(J) of this title who has been battered, abused, neglected, or abandoned, shall not be compelled to contact the alleged abuser (or family member of the alleged abuser) at any stage of applying for special immigrant juvenile status, including after a request for the consent of the Secretary of Homeland Security under section 1101(a)(27)(J)(iii)(I) of this title.

**CREDIT(S)**

AOB Addendum 5a

(June 27, 1952, c. 477, Title II, ch. 9, § 287, 66 Stat. 233; Pub.L. 94-550, § 7, Oct. 18, 1976, 90 Stat. 2535; Pub.L. 99-570, Title I, § 1751(d), Oct. 27, 1986, 100 Stat. 3207-47; Pub.L. 99-603, Title I, § 116, Nov. 6, 1986, 100 Stat. 3384; Pub.L. 100-525, §§ 2(e), 5, Oct. 24, 1988, 102 Stat. 2610, 2615; Pub.L. 101-649, Title V, § 503(a), (b)(1), Nov. 29, 1990, 104 Stat. 5048, 5049; Pub.L. 102-232, Title III, § 306(a)(3), Dec. 12, 1991, 105 Stat. 1751; Pub.L. 104-208, Div. C, Title I, § 133, Title III, § 308(d) (4)(L), (e)(1)(M), (g)(5)(A)(i), Sept. 30, 1996, 110 Stat. 3009-563, 3009-618, 3009-619, 3009-623; Pub.L. 109-162, Title VIII, § 826, Jan. 5, 2006, 119 Stat. 3065; Pub.L. 109-271, § 6(g), Aug. 12, 2006, 120 Stat. 763.)


Notes of Decisions (359)

8 U.S.C.A. § 1357, 8 USCA § 1357
Current through P.L. 118-6. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

AOB Addendum 6a